IN THE MATTER OF ROBERT M. BONIN.

Suffolk. June 5-7, 9, 12-14, 20, 1978. — July 8, 1978.

Present: QUIRICO, BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Judge. Supreme Judicial Court,* Superintendence of inferior courts. *Constitutional Law,* Judge, Public employment.

Receipt of a leased automobile by the wife of the Chief Justice of the Superior Court from a corporation which had formerly been a legal client of the Chief Justice and payment by the corporation for a reception and dinner for the Chief Justice after his appointment to that position did not, standing alone, constitute violations of the Code of Judicial Conduct or S.J.C. Rule 3:17 (2) [695]; however, the Chief Justice's subsequent conduct in appointing a relative of the corporation's president to a position in the office of the Chief Justice and his appointment of two secretaries who had performed gratuitous secretarial services for him and for the corporation while they and the Chief Justice were employed by the Attorney General of the Commonwealth constituted violations of Canon 3 (B) and Canon 2 of the Code of Judicial Conduct and S.J.C. Rule 3:17 (2) [696].

In the circumstances, neither the requirement that a judge exercise a measure of self-restraint in engaging in activities which may reflect on his impartiality nor a sanction for his failure to do so raised any serious question under the First or Fourteenth Amendment to the United States Constitution or corresponding provisions of the Constitution of the Commonwealth. [709-710]

Following evidentiary hearings on charges against the Chief Justice of the Superior Court, a majority of this court concluded that it was not proved that the Chief Justice knew before his attendance at a meeting that the meeting was intended to raise funds in the interest of criminal defendants in certain cases pending before the Superior Court and that it was likely that there would be partisan comment on the cases at the meeting. [705] QUIRICO, J., and BRAUCHER, J., concurring; WILKINS, J., joined by ABRAMS, J., concurring.

Following evidentiary hearings on charges against the Chief Justice of the Superior Court, this court concluded that, before attending a meeting that was intended at least in part as a partisan rally in the interest of criminal defendants in certain cases pending in the Superior Court, the Chief Justice had good reason to infer that the meeting would touch on matters pending in his court, that the Chief Justice was negligent almost to the point of wilfulness in ignoring information brought to his attention about the character of the meeting, and that in attending the meeting in these circumstances he violated Canons 2 (A) and 5 (B) of the Code of Judicial Conduct and S.J.C. Rule 3:17 (2). [705-707]

In a proceeding against the Chief Justice of the Superior Court, it was not proved that the Chief Justice knowingly made false statements in a press release or in testimony under oath on deposition or that he sought to have an assistant make a statement which he knew would be false or materially misleading. [710-711] Quirico, J., and Braucher, J., concurring; Wilkins, J., joined by Abrams, J., concurring.

Information filed in the Supreme Judicial Court on May 4, 1978.

*Robert W. Meserve & Mark L. Wolf*, Designated Counsel.

*Paul R. Sugarman & David J. Sargent* for the respondent.

*Ernest Winsor, James C. Hamilton, John Reinstein, Harvey A. Silverglate, Jeanne Baker & David Rosenberg*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

By the Court. Robert M. Bonin, now Chief Justice of the Superior Court (Chief Justice), was admitted to the bar of this Commonwealth in 1954. He spent the next year as a teaching fellow and graduate student at a law school, followed by three years of active duty with the Judge Advocate General's Corps of the United States Army. After completing his military service he was employed in legal research, writing and editing for about one and one-half years, and thereafter he practiced law, first as an employee in a law firm, and later as a partner in a firm formed by him and an associate. That continued until January, 1975, when he was appointed First Assistant Attorney General for the Commonwealth. He occupied that position until March 2, 1977, when he was appointed to his present position. Prior to his

appointment as Chief Justice he was engaged on a part-time basis in teaching at two law schools in the Boston area.

Some time in 1977 the Committee on Judicial Responsibility (Committee), established by S.J.C. Rule 3:17, as amended, 372 Mass. 925 (1977), commenced an investigation of alleged misconduct by the Chief Justice.[1] On December 21, 1977, this court, at the request of the Committee, appointed Robert W. Meserve, Esquire, as counsel to the Committee for that investigation and later authorized the Committee to engage Mark L. Wolf, Esquire, to assist Mr. Meserve in the investigation. On March 13, 1978, counsel submitted to the Committee a ninety-three page preliminary report on a number of matters investigated, with conclusions and recommendations of counsel thereon. The investigation by the Committee and its counsel continued after the filing of the preliminary report and was also extended to matters not covered in that report.

As the Committee's investigation progressed, the fact of the investigation as well as the nature and identity of some of the areas under investigation became the subject of comment in the news media and elsewhere. This occurred, notwithstanding the provisions of S.J.C. Rule 3:17 (2), 372 Mass. 925 (1977), that "[a]ll Committee proceedings shall be confidential and conditionally privileged except that, on request of any judge against whom proceedings have been initiated, the Committee may conduct such proceedings publicly." No such request was filed with the Committee by the Chief Justice. This court does not attribute the responsibility for the news media comments to any participants in the investigation, and recognizes that the public knowledge

---

[1] Supreme Judicial Court Rule 3:17 (2), as amended, provides in part: "On its own motion, or on complaint by any person, the Committee shall inquire into and investigate the alleged physical or mental incapacity of any judge; allegations of misconduct or maladministration in office, wilful or persistent failure to perform duties, habitual intemperance or other conduct prejudicial to the administration of justice that brings the judicial office into disrepute; and any alleged act which may violate the Code of Judicial Conduct (Rule 3:25)."

of the fact of the investigation made public speculation and comment inevitable in the circumstances.

On April 11, 1978, following events of the preceding days to be described below, this court wrote to the Chief Justice suggesting that he remove himself voluntarily from all judicial and administrative duties until final resolution of then existing allegations, and implying no judgment on the merits of any of the allegations. On the next day the Chief Justice wrote to this court respectfully declining to suspend himself voluntarily and stating reasons therefor. He asked that this court give him and his attorneys an opportunity to be heard before proceeding further. On April 12, 1978, this court informed him that it would hear him and his attorneys on the following day, and that the hearing would be limited to the question "whether without regard to the merits of any matter which is now under consideration by this Court's Committee on Judicial Responsibility, the public interest, including the effective administration of the Superior Court and public confidence in the fair administration of justice requires [your] suspension." The hearing was held as scheduled, and thereafter this court, on April 13, 1978, entered an order temporarily enjoining the Chief Justice until further order of this court, from the performance of all judicial and administrative functions as Chief Justice of the Superior Court. The order has continued to this date.

As a result of its investigation the Committee concluded that formal proceedings should be instituted against the Chief Justice, and on April 20, 1978, it caused a written "Notice of Formal Proceedings" to be served on him advising him of the institution of the proceedings to inquire into the charges, and setting forth the charges against him.[2]

---

[2] This procedure was in accordance with the following provision of the Rules of the Committee on Judicial Responsibility adopted by the Committee and approved by this court pursuant to S.J.C. Rule 3:17 (2), as amended, 372 Mass. 925 (1977): "Rule 13. *Notice of Formal Proceedings.* (a) After the preliminary investigation has been completed, if the Committee concludes that formal proceedings should be instituted, the Committee shall without delay issue a written notice to the judge advising of

On April 21, 1978, the Committee filed a motion with a single justice of this court asking that the following material be made public: (a) a portion of the preliminary report filed with the Committee by its counsel on March 13, 1978, and (b) the "Notice of Formal Proceedings" which had been served on the Chief Justice on April 20, 1978. The only part of the preliminary report which the Committee asked be made public was that relating "to matters which were investigated and not found by the Committee to warrant further action." It thus did not seek disclosure of the part of the report relating to the charges which were described in the "Notice of Formal Proceedings." The Committee also asked that it be authorized, at its discretion, to turn over to the Attorney General certain material relating to one phase of its investigation. The motion was heard by a single justice on April 21, 1978, and allowed on April 27, 1978.

On May 3, 1978, a single justice reported to the full court for its consideration and decision the question "[w]hether the formal charges returned by the Committee against Chief Justice Bonin on April 20, 1978, shall be entered in the office of the Clerk of the Supreme Judicial Court for the Commonwealth, and there treated as an information to be heard, decided and disposed of by the Full Court." The question thus reported was argued before the full court on May 4, 1978, and on that day the full court entered an order answering the question in the affirmative. The order provided further that the Chief Justice file his answer or other pleadings thereto on or before May 12, 1978, and that hearings on the Information commence before the full court not later than June 5, 1978. The required answer was filed on May 12, 1978. The Information and answer are appended as Appendices A and B. Hearings before the full court started on June 5, the presentation of evidence was com-

the institution of formal proceedings to inquire into the charges. . . . (b) The Notice shall state in concise language the charges against the judge including references to any sections of the Code of Judicial Conduct which the judge is charged with having violated, and the alleged facts upon which such charges are based."

pleted on June 14, and final arguments were heard on June 20, 1978.

## *Summary of Pleadings.*

The pleadings in this proceeding consist of the Information and the respondent's answer thereto. The Information is based on the "Notice of Formal Proceedings" which the Committee caused to be served on the respondent on April 20, 1978. It includes nine separately numbered charges of alleged improper conduct by the respondent. Each charge consists of several numbered paragraphs of factual allegations followed by a concluding paragraph charging that by reason of the facts alleged the respondent violated one or more of the provisions of S.J.C. Rule 3:17, as amended, 372 Mass. 925 (1977), or of S.J.C. Rule 3:25, 359 Mass. 841 (1972), which prescribed a "Code of Judicial Conduct." The respondent answered each numbered charge separately. We summarize the charges and the answers thereto.

*First charge.* It may be helpful to state at this point that the first six charges stem from the respondent's attendance at a gathering (meeting) at the Arlington Street Church in Boston on April 5, 1978. It is alleged in all six charges that the respondent purchased tickets for the meeting which was for the benefit of the Boston/Boise Committee, that he in fact attended the meeting, and that the principal speaker was Gore Vidal whose subject was "Sex and Politics in Massachusetts." The respondent admits these allegations as to all six charges in which they are contained, and he adds that the price of admission to the meeting was five dollars per person.

The first charge continued with the following allegations. Before attending the meeting the respondent was informed, and should have known and knew that the proceeds of the ticket sales were intended to be used in part for the benefit of the defendants in a group of twenty-four criminal cases (the Revere cases) which he knew were then pending in the Superior Court, to assist the defendants in their defense of

such cases and to assist witnesses and others involved in the cases.

The respondent denies these allegations.

*Second charge.* Before attending the meeting the respondent knew or should have known that the Revere cases would be or were likely to be discussed. Those and other criminal cases which the respondent knew might be heard in the Superior Court were discussed in his presence, and the discussion included statements concerning the merits of the cases, criticism of the administration of justice in relation to those cases, and expressions of doubt whether the defendants could receive a fair trial.

The respondent denies these allegations. He admits the accuracy of the transcripts of what was said at the meeting, but he adds that it is not alleged that he heard any "discussion" at the meeting, and that his sole purpose in attending was to hear Gore Vidal.

*Third charge.* Statements were made at the meeting in the respondent's presence concerning the status and merits of the Revere cases, denouncing them as improperly motivated, and indicating that it was unlikely that the defendants in the cases could or would receive a fair trial. It was stated that the proceeds of the ticket sales would be used largely for the benefit of the defendants and others involved in the Revere cases. There were also statements on the status and merits of other criminal matters which the respondent knew might be heard in the Superior Court. The respondent did not leave the meeting at any time until its conclusion.

The respondent admits the accuracy of the transcripts of the meeting and acknowledges that he did not leave the meeting before its conclusion. He again notes that it is not alleged "that the remarks and statements of all of the speakers were heard and understood," and specifically denies that he heard any remarks which imposed upon him any duty to leave the meeting. He states that "a reading of the entire transcript of the event does not reveal any material that would under the law have imposed upon him any duty to leave."

*Fourth charge.* After incorporating the first three charges, it is further alleged that the respondent met with Gore Vidal at the end of the meeting and engaged in a friendly conversation with him, knowing that this was likely to be photographed and knowing that this would give the appearance that he indorsed the criticism at the meeting of the administration of justice and that he indorsed the raising of funds for the benefit of the defendants in the Revere cases. The respondent's meeting and conversation with Vidal were photographed and publicized.

The respondent, in addition to his answer to the allegations in the first three charges, admits his meeting and conversation with Vidal and that it was photographed and publicized. He denies the additional allegations. He answers further that "this charge is repugnant to the basic fundamental rights of any person."

*Fifth charge.* On April 11, 1978, the respondent stated under oath that before going to the meeting he made no inquiry about the nature of the Boston/Boise Committee and was not advised that committee would use funds raised by the meeting for the benefit of the defendants or others involved in the Revere cases, that there was no reference at the meeting about the use of the funds derived therefrom, that there was no reference to the Revere cases prior to the remarks by one Thomas Reeves, and that the only remark by Reeves about the cases pertained to the age of the alleged victims. The above statements by the respondent were material to the investigation then being conducted, and he should have known and, in fact, knew that they were false. On April 7, 1978, the respondent issued a press release stating that he did not learn of the intended use of the funds derived from the meeting until the day after the meeting. The respondent should have known and, in fact, knew that the statement was false.

As to the alleged false testimony the respondent denies that he made any statement which he knew to be false and says that he testified in good faith to the best of his recollec-

tion. As to the press release he admits issuing it but denies that any statement in the release was false.

*Sixth charge.* After incorporating the first three charges, it is further alleged that the respondent knew before he attended the meeting on April 5, 1978, that his administrative assistant, Francis X. Orfanello, had advised him in substance and effect that the proceeds of the meeting would be used for the defense of defendants in the Revere cases. On April 6, 1978, the respondent sought to have Mr. Orfanello make a false and misleading statement to the effect that he had told the respondent only that the meeting was "for gays or gay people."

The respondent, in addition to his answer to the first three charges, denies all of the allegations of the sixth charge.

*Seventh charge.* We note that the seventh through ninth charges are unrelated to the first six. They allege improper conduct by the respondent as Chief Justice of the Superior Court in several matters relating to or involving the Richard J. Conboy Insurance Agency, Inc. (Conboy), and several of its officers and directors.

The respondent became Chief Justice of the Superior Court on March 7, 1977. Thereafter Conboy paid $385 for a reception held for the respondent on March 7, 1977, and $1,700 for a dinner given for the respondent on March 10, 1977. In 1977, Conboy paid over $1,800 for the rental of an automobile leased in the name of the respondent's wife and used by the respondent and his wife. Conboy's business includes the sale of multiple employer group life insurance to attorneys in Massachusetts and elsewhere.

The respondent admits that Conboy paid for the reception and dinner but denies that Conboy or anyone connected with Conboy was listed as a host or sponsor for either event. He admits the allegations about the automobile but states that "the cost was charged to individual officials of Conboy."

*Eighth charge.* The allegations of the seventh charge are incorporated by reference and the following are added

thereto. The car rental payments by Conboy for the leased automobile were ultimately treated by Conboy as compensation to Martin J. Kelley and two other Conboy officials. Kelley is an officer and director of Conboy. In August, 1977, the respondent appointed Kelley's stepsister (half sister) as a secretary in the office of the Chief Justice of the Superior Court.

The respondent admits these allegations and says that the appointment of the half sister was made strictly on the basis of merit.

*Ninth charge.* The allegations of the seventh and eighth charges are incorporated by reference and the following are added thereto. While the respondent was the First Assistant Attorney General, Pauline Dionne Mastronardi and Mary Stanton were employed there as secretaries and worked for and under the supervision of the respondent. During that period the respondent rendered legal services to Conboy and an affiliated corporation (the Conboy matter) for which he received $25,000 at the rate of $1,000 per month. Also during that period Mastronardi and Stanton performed secretarial services in connection with the respondent's representation of Conboy, and an attorney working in the office of the Attorney General and under the respondent's supervision as his assistant performed services in the Conboy matter. Neither the two secretaries nor the attorney were compensated for their services in the Conboy matter. In August, 1977, the two secretaries, Mastronardi and Stanton, were appointed as secretaries in the office of the Chief Justice of the Superior Court.

The respondent admits these allegations but states the work by the three persons in question was done on a voluntary basis. He states further that the two secretaries were appointed to positions in the office of the Chief Justice of the Superior Court strictly on the basis of merit.

### Findings, Discussion and Conclusion.

Most of the objective facts alleged are admitted or were proved by evidence. The principal facts in issue relate to such questions as what the Chief Justice knew or should have known at critical times, or what connection there was between one admitted fact and another. We state and discuss the facts as we find them under two separate headings: (A) Charges Concerning the Chief Justice's Relationship with a Former Client, and (B) Charges Related to the Events at the Arlington Street Church on April 5, 1978. The facts so stated are established by a fair preponderance of the evidence, and are joined in by the entire court. Some Justices would make the additional findings indicated by their separate opinions.

A. *Charges Concerning the Chief Justice's Relationship with a Former Client.*

### Findings of Fact.

1. While the respondent was serving as First Assistant Attorney General, he performed legal services for the Richard J. Conboy Insurance Agency, Inc. (Conboy), its affiliate Northeast Administrators, Inc., and two officers of Conboy, in connection with an antitrust case pending in the United States District Court, District of Massachusetts.

2. The respondent, while First Assistant Attorney General, received $1,000 each month for his services in the antitrust case, and $25,000, totally, during the time he served as First Assistant Attorney General.

3. Conboy's business includes selling group life insurance to attorneys in Massachusetts and elsewhere. About 600 lawyers are persons insured through Conboy.

4. Martin J. Kelley is president and treasurer, a director, and one of the stockholders of Conboy. Roberta Downey (Downey) is a half sister of Kelley. They have a close relationship. Kelley brought his half sister's interest in obtaining employment to the attention of the respondent while he was

serving as First Assistant Attorney General. The respondent recommended that she be hired, and Downey was hired to work in the torts division of the Attorney General's office.

5. Pauline Dionne Mastronardi (Mastronardi) and Mary Stanton (Stanton) worked as secretaries in the office of the Attorney General for and under the direction of the respondent. While so employed, Mastronardi and Stanton performed secretarial services for the respondent in connection with the Conboy antitrust suit. Neither was compensated by the respondent or Conboy (or its affiliate) for those services. Some of these secretarial services were performed during working hours for which Mastronardi and Stanton were compensated by the Commonwealth.

6. During a portion of the time while he was First Assistant Attorney General, the respondent used the services of an assistant attorney general, who was working specifically for him, in the preparation of part of a memorandum to be filed in the Conboy antitrust case. The assistant attorney general performed some of these services during normal working hours. She was not compensated or offered compensation by the respondent or Conboy (or its affiliate). The Attorney General did not authorize the respondent to use the assistant on this private matter. The Attorney General had a rule against assistant attorneys general engaging in private practice, and the respondent as First Assistant Attorney General was assigned the responsibility of enforcing that rule. The Attorney General had made an exception to this rule in connection with the respondent's representation of Conboy, its affiliate, and officers in the Federal antitrust case.

7. On March 7, 1977, a reception was held at the State House following the swearing in of the respondent as Chief Justice of the Superior Court. Conboy subsequently paid $385, representing the cost of the reception, and treated the payment as a business expense. On March 10, 1977, a reception and dinner was given in honor of the Chief Justice. The invitations were printed as if the Attorney General and his wife were the host and hostess, but the Attorney General did not know who was paying for the function. Conboy

In the Matter of Bonin.

paid the cost of the reception and dinner in an amount in excess of $1,700 and treated that amount as a business expense.

8. From March through September, 1977, Conboy paid in excess of $1,800 for the rental of a Ford LTD automobile leased in the name of the Chief Justice's wife. The Chief Justice and his wife used the vehicle. Initially, Conboy treated the payments as tax deductible, but later, on advice of its accountant, revised its records to show the payments as income to Kelley and two other Conboy officers. The Chief Justice considered the propriety of these payments under the Code of Judicial Conduct before they were made. There is no indication that Conboy, its affiliate, or officers had any cases pending in the Superior Court. The Chief Justice filed a report with the Executive Secretary to the Justices of this court on or before April 15, 1978, disclosing the rental payments as a gift.

9. In August, 1977, the Chief Justice appointed Downey, Kelley's half sister, as a secretary in the office of the Chief Justice of the Superior Court. She was hired at an annual salary almost $2,000 higher than she had been paid as a secretary at the Attorney General's office.

10. In August, 1977, the Chief Justice appointed Mastronardi and Stanton as secretaries in the office of the Chief Justice of the Superior Court. Each was hired at an annual salary approximately $1,000 higher than she had received in the Attorney General's office.

11. Although other individuals employed at the Attorney General's office asked the Chief Justice for employment in the Superior Court, the Chief Justice hired only Downey, Mastronardi, and Stanton. There is no indication that any of these individuals is not a competent secretary.

*Discussion.*

Canon 5 (C) (4) of the Code of Judicial Conduct, 359 Mass. 848 (1972), states that a judge or member of his family residing in his household should not accept a gift except in

certain stated circumstances. One such circumstance, set forth in Canon 5 (C) (4) (c), permits the receipt of a gift by the judge or a member of his family residing in his household "if the donor is not a party or other person whose interests have come or are likely to come before him, and, if its value exceeds $100, the judge reports it in the same manner as he reports compensation in Canon 6C." [3] The Chief Justice made such a report on or before April 15, 1978, with respect to the payments made by Conboy, or its officers, on the motor vehicle lease.

Thus a judge may receive a gift having a value of more than $100 but must report the gift. However, the propriety of such a gift is not beyond scrutiny and criticism simply because it is not forbidden by Canon 5 (C) and is reported. In all his activities, a judge should not only avoid impropriety but also he should avoid the appearance of impropriety. Canon 2, 359 Mass. 842 (1972). The requirement of Canon 2 (A) that a judge "should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary" may make a gift inappropriate.

In a proceeding concerning a gift made before the Code of Judicial Conduct was effective in this Commonwealth, we censured a judge, and ordered him to pay $5,000 to the Commonwealth as costs of the proceedings, where the judge received a gift of $4,000 from an individual after he made inquiry of a prosecuting officer concerning a case pending against that individual. *Matter of Morrissey*, 366 Mass. 11 (1974). We concluded that the judge's conduct constituted "a careless disregard" of the requirement that a judge's conduct avoid even the appearance of impropriety. *Id.* at 16.

---

[3] Canon 6 (C), 359 Mass. 852 (1972), requires a judge to "report on or before April 15 of each year, with respect to the previous calendar year, the date, place, and nature of any activity for which he received compensation, and the name of the payor and the amount of compensation so received." The report should be filed with the Executive Secretary to the Justices of the Supreme Judicial Court as a public document.

The drafters of the Code of Judicial Conduct adopted by the American Bar Association, on which our Code of Judicial Conduct is based, concluded that public disclosure of gifts exceeding $100 in value would encourage adherence to the principle of avoiding any appearance of impropriety. E. W. Thode, Reporter's Notes to the Code of Judicial Conduct 85 (1973). "If the judge and the donor are not willing for the transaction to be given the light of publicity, the judicial system is better served by not having the transaction consummated." *Id.*

As matters developed, the receipt of the gift of the leased automobile created the appearance of impropriety. During the period when Kelley and two other Conboy officers were making monthly payments on the leased automobile, the Chief Justice appointed Kelley's half sister to a position in the office of the Chief Justice at an annual salary of $2,000 above that which she was receiving as a secretary in the Attorney General's office. This act created the possibility that the public would regard judicial conduct of the Chief Justice (and by inference judicial conduct of other judges) as subject to influence based on personal favoritism. It did not promote "public confidence in the integrity and impartiality of the judiciary." Canon 2 (A). Moreover, the appointment of Downey in these circumstances reasonably could create the impression that the Chief Justice engaged in "favoritism" in the exercise of his power to make appointments, acting contrary to the direction of Canon 3 (B) (4).[4]

The appointment of Mastronardi and Stanton as secretaries in the office of the Chief Justice of the Superior Court was, by itself, not improper. There is no suggestion that they were not competent to perform the duties of their positions. When, however, the Chief Justice appointed Mastronardi and Stanton, he knew that they had performed gratuitous secretarial services for him and indirectly for

---

[4] Canon 3 (B) (4), 359 Mass. 842 (1972), provides in part: "[The judge] should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism."

Conboy. Their appointments implied that the Chief Justice would favor persons who had contributed their services to him and to his former clients over others who had not. Only Mastronardi and Stanton, who worked on the Conboy antitrust case without compensation and Downey, who was related to the president of Conboy, were hired from the Attorney General's office, although others had sought to transfer from the Attorney General's office to the office of the Chief Justice. The Chief Justice's conduct in appointing Downey, Mastronardi, and Stanton created the impression that employment opportunities in the judicial branch of goverment were greater for persons and relatives of persons who had made gifts to, and done favors for, the appointing authority.

Conboy's payment of the cost of the State House reception and the cost of the dinner for the Chief Justice may not have been gifts to the Chief Justice. Conboy itself regarded the expenses as tax deductible expenditures. These expenditures were made in sincere appreciation of the Chief Justice's services as counsel for Conboy. However, the fact that Conboy made these payments, combined with the Chief Justice's subsequent reward of employment at higher salaries to Kelley's half sister and two persons who had worked gratuitously on the Conboy antitrust case, did not promote "public confidence in the integrity and impartiality of the judiciary." Canon 2 (A). These appointments created the impression that Conboy's officers were "in a special position to influence [the Chief Justice]." Canon 2 (B).

To deal with the particular charges:

The seventh charge is based on the claim that the receipt of the gift of the leased automobile and the payment by Conboy of the cost of the State House reception and of the dinner were violations of Canon 2, Canon 2 (B), and S.J.C. Rule 3:17 (2). These events, standing alone, are not violations as alleged, but they must be viewed also in relation to the eighth and ninth charges.

The eighth charge concerns the appointment of Downey as a secretary in the office of the Chief Justice of the Superior Court. It cites Canon 3 (B), concerning the exercise of a judge's appointing power solely on the basis of merit; Canon 2, concerning the avoidance of impropriety or the appearance of impropriety; and S.J.C. Rule 3:17 (2), concerning misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute. The appointment of Downey, in light of the Conboy gift and the payments made by Conboy for events held in the Chief Justice's honor, was a violation as alleged in the eighth charge.

The ninth charge concerns the appointment of Mastronardi and Stanton as secretaries in the office of the Chief Justice of the Superior Court. This charge also rested on alleged violations of Canon 3 (B), Canon 2, and S.J.C. Rule 3:17 (2). In light of the Conboy gift and Conboy's payments for events held in the Chief Justice's honor, in the light of the rendering of uncompensated services on the Conboy antitrust matter by Mastronardi and Stanton, and in light of the apparent preferential treatment given to Mastronardi and Stanton over other applicants for appointments (except Downey), the appointments by the Chief Justice were violations as alleged in the ninth charge.

B. *Charges Related to the Events at the Arlington Street Church on April 5, 1978.*

### Findings of Fact.

1. In December, 1977, the Boston/Boise Committee (committee) was organized as "a committee of outrage at the recent handling of 24 indictments for alleged sex acts between men and boys in the Boston area." The committee sponsored a fund-raising event at the Arlington Street Church on Wednesday, April 5, 1978, with Gore Vidal, a noted author, as the featured speaker. Before the event the committee had conferred with attorneys for some of the defendants in the criminal cases, sometimes referred to as

"the Revere cases." The attorneys had budgeted $25,000 for a survey of attitudes of prospective jurors by the National Jury Project. On March 27, 1978, a co-chairman of the committee wrote one of the attorneys that "we will make a contribution from our General Fund shortly after April 5, to help toward the $25,000 total cost as indicated in the budget submitted by the NJP and forwarded to me by you."

2. On Sunday, April 2, 1978, the Boston Globe printed a brief announcement: "Author Gore Vidal will discuss 'Sex and Politics in Massachusetts' Wednesday evening at the Arlington Street Church. Admission is $5 and the funds will be used to benefit the Boston/Boise Committee." The Chief Justice saw the announcement and after lunch on Monday, April 3, went with a friend to the church, where they purchased four tickets. He asked the woman who sold the tickets what Boston/Boise was all about, and she answered, "It was a committee that was formed to counteract the negative publicity that had resulted from the indictments in Revere in December, the discontinuance of the hotline which was effective, hotline had been instituted by District Attorney Mr. Byrne, apparently. I am not sure who instituted that hotline for anonymous tipsters, but they had been less effective in gathering information than in the thirty days that the hotline was in effect, getting that information destroyed or done away with." Two witnesses who were present either did not hear or failed to remember the inquiry and the response. The Chief Justice identified himself, asked if seats could be reserved, and left his card, with his office telephone number, to make an answer possible.

Later that day the Chief Justice had a conversation with people in his office about his attending a lecture to be given by Gore Vidal at the Arlington Street Church. There was reference to the church as a controversial church, of activities there including draft card burnings, and of the possibility that some motorcycle riders might be there. In that conversation the Chief Justice referred to Gore Vidal as a "gay," apparently meaning an avowed homosexual.

3. On April 4, 1978, William P. Homans, counsel for one of the defendants in the Revere cases, received a telephone message from the Boston/Boise Committee informing him that the Chief Justice would be at the Gore Vidal lecture on April 5, 1978. After receiving that message, Mr. Homans called Mr. Brian McMenimen, counsel for another of the defendants in the Revere cases, informed him of the message and said that they owed it to the Chief Justice to advise him that this was a fund raiser, the proceeds of which would be used to benefit the defendants in the Revere cases. They then agreed that Mr. McMenimen would call either the Chief Justice or Mr. Orfanello to give them that information.

On April 5, 1978, Mr. McMenimen called Francis X. Orfanello, the administrative assistant to the Chief Justice. Mr. McMenimen told Mr. Orfanello that he understood the Chief Justice was planning to attend a lecture that night by Gore Vidal, sponsored by the Boston/Boise Committee. He referred to the Revere cases and said that the committee was formed for the benefit of those defendants, that the proceeds of the lecture were going to be used to defray some of the legal costs associated with the defense of those cases. He said "that the Chief Justice couldn't possibly know that this is, in essence, a defense fund raiser or else he'd never in a million years go to it." There was discussion of the committee and its connection with the "gay rights movement." Mr. Orfanello said he would give the Chief Justice the message.

The Chief Justice was in a committee meeting in his office, and Mr. Orfanello told the Chief Justice's secretary that he would like to see the Chief Justice as soon as there was a break. He then told Francis M. Masuret, Jr., the associate administrative assistant, about the telephone call. He testified that he told Mr. Masuret that the lecture at the church was a fund raiser for criminal defendants, but Mr. Masuret testified that he did not remember mention of a fund raiser. Mr. Masuret did, however, recall reference to Mr. McMenimen as attorney for one of the criminal defendants.

4. Shortly thereafter, there was a break in the meeting and the Chief Justice came out of his office and had a conversation with Mr. Orfanello lasting about thirty seconds. Mr. Orfanello told the Chief Justice about the call from Mr. McMenimen, including the fact that the Boston/Boise Committee was sponsoring the Gore Vidal lecture and that the committee was a "gay rights" or "gay benefit group." The conversation ended with the Chief Justice's asking how Mr. McMenimen knew that the Chief Justice was going to the lecture, and Mr. Orfanello saying that he did not know. Mr. Orfanello testified that he told the Chief Justice the meeting was for the defense of the criminal defendants. The Chief Justice denied that anything was said about a fund raiser or use of the funds for the benefit of any particular defendants.

After this conversation Mr. Orfanello said to Mr. Masuret that Mr. Orfanello did not think the Chief Justice would pay any attention to what he had been told. Later, after Mr. Orfanello had left for the day, the committee meeting in the Chief Justice's office ended, and the Chief Justice and Mr. Masuret left the court house together. Mr. Masuret did not think the Chief Justice should attend an affair sponsored by a "gay organization," and he tried to bring up the subject, referring to the "very strange call" from Mr. McMenimen and asking why people on the outside would be concerned enough to call the office. The Chief Justice said he didn't know what the excitement was all about, and asked, in substance, "What is this, a dictatorship or Nazi Germany?" Mr. Masuret felt rebuffed, and did not pursue the subject.

5. At this time the Chief Justice knew from news media reports that the Revere cases were pending in the Superior Court. He also knew that homosexual cases arising out of arrests at the Boston Public Library were pending in the Boston Municipal Court and might eventually be tried in the Superior Court. He was not scheduled to sit as a judge in any of these cases, and would not in regular course be called on to assign a judge to them unless there was a request or a special reason.

The Chief Justice should have known that the meeting at the Arlington Street Church would at least in part be a partisan rally in the interest of criminal defendants in cases pending in the Superior Court, that the Revere cases were likely to be discussed, and that the proceeds of ticket sales might be used in part for the benefit of the defendants in those cases. The Chief Justice should also have known that his attendance would not promote public confidence in the judiciary, and that it might reflect adversely on his impartiality, interfere with the performance of his judicial duties, and bring the judicial office into disrepute.

6. On the evening of April 5, the Chief Justice, his wife and another couple attended the Gore Vidal lecture, arriving about 7:45 P.M. They were ushered to reserved seats in the second or third row, and remained throughout the program. The Chief Justice was asked whether he wanted to sit in the front row, and answered, "Why?" He was asked whether he wanted to be introduced, and answered that he did not.

Before Gore Vidal spoke there were several other speakers. There was discussion of the Revere cases and the Boston Public Library cases, of harassment of "gays" by the district attorney and the police, and of the current "witch-hunt" and "show trials." One of the speakers said that over 1,500 people were present and "most of this money will be going to the defense of the witnesses themselves, the so-called victims, their parents, and to the National Jury Project which has entered these cases in order to see that a fair trial can possibly exist."

Before Gore Vidal spoke there was a high degree of distraction and confusion, and the Chief Justice engaged in conversations with the others in his party. He and others testified that the proceedings were boring and that they heard only portions of the proceedings, although they could hear what was said from the pulpit when they listened. But he admitted hearing references to police arrests at the Boston Public Library, to the ages of the alleged victims in the Revere cases, and to police harassment, and we infer that he

heard other statements about the Revere cases. He did hear what Gore Vidal said, and Gore Vidal discussed "very sinister" happenings in Boston attributable to the fact that 1978 is an election year, "the Revere Beach capers," a "witchhunt," and "entrapment" in the Boston Public Library arrests.

7. After the lecture the Chief Justice was taken into an anteroom and introduced to Gore Vidal. He told Gore Vidal that he enjoyed the speech, and said it was "wrong to assume judges are troglodytes" (cave dwellers). The Chief Justice knew that his picture was being taken during the evening, but did not realize that a picture was being taken when he was talking to Gore Vidal. Either just before or just after he spoke to Gore Vidal, the Chief Justice met Mr. McMenimen, who introduced himself. The Chief Justice asked whether he was the man who called Mr. Orfanello, and Mr. McMenimen answered, "Yes."

8. On the morning of Thursday, April 6, a Boston newspaper carried a picture of the Chief Justice on the front page and a news story with the headline, "Bonin at benefit for sex defendants." On page three of the same newspaper was additional material and a picture of the Chief Justice chatting with Gore Vidal. Both the Chief Justice and Mr. Orfanello read the story. Some time before 9 A.M. they had a brief conversation in which there was reference to the story. Also before 9 A.M. Mr. Orfanello called the senior associate justice of the Superior Court and at least one other associate justice and called attention to the story. In both calls he said he had told the Chief Justice before the lecture that the proceeds were to be used for the defense of criminal defendants. He also talked on the telephone to Mr. McMenimen and said he had given the Chief Justice the message.

Later the same day the Chief Justice told Mr. Orfanello that counsel for the Chief Justice wanted to talk to Mr. Orfanello. After that convesation, Mr. Orfanello had the impression that the Chief Justice wanted him to say that the Chief Justice only knew that the lecture was for a "gay"

group and that the Chief Justice did not know it was for a defense fund. Subsequently he talked on the telephone to counsel for the Chief Justice, and said he had told the Chief Justice the lecture was for a "gay" group, but did not say that he had told the Chief Justice it was a fund raiser. Indeed, he told counsel that Mr. McMenimen had not told him anything about a fund raiser.

9. Early on the morning of Friday, April 7, counsel for the Chief Justice interviewed Mr. Orfanello. For the first time Mr. Orfanello told counsel that Mr. McMenimen had told him that the lecture was a fund raiser. He also said to counsel that he had omitted that fact in giving the Chief Justice the message, and had told the Chief Justice only that it was a "gay benefit." At counsel's request Mr. Orfanello wrote out and signed a statement of the events. The statement referred to Mr. McMenimen's statement that the talk was sponsored by a committee "which was raising money for the defense of some people who were involved with children in East Boston or Revere," but said only the following as to what Mr. Orfanello told the Chief Justice: "I told him I had received a call from an attorney who said he had heard he was going to the Gore Vidal lecture that night and that it was a gay group, or gay benefit, or some other descriptive words implying gay people. I don't recall what description I used. The Chief asked me how the attorney knew and I said I didn't know." After Mr. Orfanello had written the statement, counsel said, "You could be accused of covering up for the Chief Justice," and he responded, "That's the way it happened."

Later on the same day, the Chief Justice issued a press release, drafted with the assistance of counsel, stating among other things, "Prior to my attending the lecture, I did not know that any of the funds from the ticket sales would be used in any defense fund, pending cases or, indeed, for any purpose other than as stated in the *Globe* or on the ticket. In fact, I did not learn of the intended use of these funds until reading it in the press on April 6, 1978, the day following the lecture."

On April 7 or 8 the Chief Justice received a letter from the District Attorney for the Suffolk District, listing the twenty-four Revere cases, referring to the discussion of the cases at the Arlington Street Church, and requesting "that you not sit yourself on the following cases, and take no part in assigning the trial justice to them." The Chief Justice responded on April 10, pointing out that he would not ordinarily assign the cases unless specifically requested, stating that he had not participated in trial or assignment of any of the cases, referring to his public statement that he had no prior knowledge of the fund raising, and adding, "However, in view of the media coverage and to allay any possible public misconception, I will not participate in or assign any of these cases. Should any requests be forthcoming, they will be referred to the senior trial justice." The same day he wrote a similar letter to the chairman of the Committee on Judicial Responsibility, adding that he had in fact not been sitting on new cases for the past three weeks, had not assigned himself to sit for the month of April, and would not assign himself to sit until the committee issued its findings relative to the investigation.

10. On Tuesday, April 11, the Chief Justice testified under oath on deposition. The following questions and answers were part of his testimony:

(a) Q. "Did you make any inquiry of any of these people with whom you talked as to the nature of the Boston/Boise Committee?"

A. "No."

This testimony is contrary to our finding in paragraph 2 above.

(b) Q. "Did you receive from any source [before the meeting] information that this talk was being sponsored by a committee which was raising money for the defense of people involved in Revere?"

A. "I did not."

(c) Q. "In any of those preliminary remarks that you heard and listened to, was there any reference to the cases pending in the Suffolk Superior Court?"

A. "No, I don't believe so. I believe there was reference to the Boston Public Library and police arrests at the Boston Public Library."

The Chief Justice then volunteered testimony that the speaker immediately preceding Mr. Vidal mentioned the Revere cases and the ages of the victims. In fact the speaker who mentioned those facts was Thomas Reeves, and he was followed by one John Mitzel, who introduced Mr. Vidal.

Q. "In any event, you remember no reference to the Revere cases prior to the introduction [by Reeves] of Mr. Vidal; is that correct?"

A. "Except as I have just mentioned."

Q. "I say, prior to the introduction of Mr. Vidal."

A. "Well, I would phrase it during the introduction of Mr. Vidal."

Q. "But before that, you had heard no mention of the Revere case?"

A. "That's true."

In fact, the Revere cases were mentioned before Mr. Reeves spoke.

(d) Q. "Was anything said about the funds, the use of the funds, to be derived from the meeting?"

A. "No. To date, having read the media, I do not know the use of the funds derived from the meeting since I have seen several conflicting media reports about it."

The answer, "No," is contrary to the fact.

(e) Q. "Now let me ask you, I think we got to the description of the introductory remarks by the gentleman who introduced Mr. Vidal, and I think you said that you thought that somewhere in those remarks there had been a reference to Revere."

A. "The only remark I can remember — and I don't remember well because of not paying much attention — was something about alleged victims being 22 or 20, and I don't know if that meant now or at the time of alleged offenses or what."

There were other relevant remarks.

11. Mr. Orfanello knew on Thursday, April 6, and at all subsequent times, that his recollection of the events of April 5 was contrary to the statements he had made to counsel for the Chief Justice and contrary to the Chief Justice's press release of April 7. On Sunday, April 9, and thereafter Mr. Masuret urged him to inform the Chief Justice or his counsel of the discrepancy, but he did not do so. On Tuesday, April 11, after the deposition of the Chief Justice, a sworn statement was taken from Mr. Orfanello. About an hour before the statement was taken, Mr. Orfanello said to counsel for the Chief Justice, "Paul, if I testify to Mr. Meserve under oath, I will bury the Chief." Counsel responded, "Frank, why didn't you tell me this before?"

### Discussion.

First we state briefly what, in the opinion of a majority of the court, remains unproved. It is not proved that the Chief Justice actually knew or understood before he attended the meeting at the Arlington Street Church on April 5, 1978, that the meeting would be a fund raiser for, or would concern itself specifically with, the Revere cases pending in the Superior Court. Whatever Mr. Orfanello said to Mr. Masuret or the Chief Justice on April 5, it is not proved that he succeeded in making either of them aware that the meeting would be of that character. It is not proved that the Chief Justice on April 6 sought to have Mr. Orfanello make a statement which the Chief Justice knew would be false or misleading if made. It is not proved that the Chief Justice knew the press release of April 7 was false when issued. Nor is it proved that the Chief Justice knew on April 11, 1978, when he gave the testimony quoted in paragraph 10 of the foregoing findings, that that testimony was false in any material particular: any discrepancies between the testimony and the facts can be accounted for by the Chief Justice's inattention or uncertain memory.

It appears from the findings that the Chief Justice was negligent almost to the point of wilfulness in ignoring or

brusquely dismissing information brought to his attention as to the character of the meeting — that the Revere cases would likely come in for partisan discussion, and that part of the proceeds of the meeting would likely be destined for the benefit of the defendants in those cases. Although the Chief Justice is not shown to have known these things as he entered the meeting, he had earlier been put on sufficient inquiry to try to find out. In all events, he should have learned enough during the meeting, and in fact did learn enough the following morning, to realize that his attendance at the meeting might well be viewed as improper. He took some measures to moderate the public reaction, but they were not as prompt or as effective as they should have been.

Upon the findings, it is the unanimous opinion of the court that the Chief Justice's behavior was improper. The conclusion follows from traditional and accepted principles.

Clearly it would be improper for the Chief Justice to attend the meeting knowing that the avails were to be used as a defense fund or knowing that the pending cases would be then made the subject of partisan comment. Indeed the Chief Justice has himself indicated his agreement that such knowing conduct would be improper. This appears not only in his statement for the press on April 7 and his letter of April 10 to the chairman of the Committee on Judicial Responsibility, but also in his cross-examination in the proceedings before us. But if knowing conduct would be an impropriety, then it seems to the court that it was likewise an impropriety, although a lesser one, for the Chief Justice, in his impatience or rashness, to fail to take heed of information and warnings which would have brought more definite knowledge to him if he had considered or pursued them seriously.

What was put in jeopardy by this neglect was the impartiality demanded of judges, as well as the appearance of impartiality, also demanded of them. A judge must distance himself from pending and impending cases by taking reasonable precautions to avoid extrajudicial contact with

them. That duty is at the heart of the Code of Judicial Con-
duct. See S.J.C. Rule 3:25, Canons 2 (A), 3 (A) (4), 5, 359
Mass. 842, 848 (1972). The duty certainly falls with no less
force on a Chief Justice with extensive administrative re-
sponsibilities than on a judge of the rank and file; and in the
circumstances of the present case, and considering the mat-
ter from the viewpoint of reasonable members of the public,
it can be no more than a quibble to contend that the Chief
Justice could claim indulgence because he might not be
called on to assign or try the relevant cases himself.

Certain of the evils flowing from disregard of the obliga-
tion of impartiality were realized conspicuously in the situa-
tion at bar. By his attendance at the meeting the Chief
Justice not only exposed himself to ex parte or one-sided
statements and argumentation on matters before his court,
but further compromised his position by seeming to favor or
to have particular sympathy with the views of the partisan
group which sponsored the affair. Indeed, the Chief Justice
shortly felt it necessary or desirable to disengage himself at
least temporarily from official participation in the cases (see
his letter of April 10 to the district attorney) — a self-
induced disqualification which was itself to be avoided.
Compare Canon 5 (C) (3). There can be little doubt that the
episode had — and, we think, could have been expected to
have — a negative effect on the confidence of the thinking
public in the administration of justice in the Common-
wealth.

It was suggested during the proceedings that judges
should not be deterred from informing themselves about
contentious issues of social importance, and that judges are
helped in their professional thought and judgment by ac-
quainting themselves with ideas and feelings current in their
communities. Hence, it was argued, the Chief Justice's at-
tendance at the meeting of April 5, which included the an-
nounced lecture by Gore Vidal, was not only not exception-
able but was commendable. The argument went so far as to
intimate that to discipline the Chief Justice in these circum-
stances would invade his constitutional rights as a citizen —

which he did not renounce or forgo by becoming a judge — to enjoy the benefits of free speech and of association with his fellow citizens.

We agree emphatically that "[c]omplete separation of a judge from extrajudicial activities is neither possible nor wise; he should not become isolated from the society in which he lives." ABA commentary[5] on Canon 5 (A). We agree that it is well for a judge's intellectual interests to extend to a comprehension of the attitudes and beliefs of minority groups, not excepting minorities which are defined by their sexual views or preferences or behavior. In ordinary circumstances the Chief Justice or any judge would be entirely free to attend a public lecture about sex and politics whether or not sponsored by a "gay" group. Nor is a judge under any duty in ordinary situations to inquire minutely into the sponsorship of public meetings before undertaking to attend them. Excessive caution, self-consciousness, or self-abnegation of this kind is neither required nor desirable.

The special factor or difficulty in the present case — the stone of stumbling — which did call for caution was that the Chief Justice had good reason to infer that the particular meeting would trench on matters pending in his court; and so it did in fact. That called for a measure of abstention on his part. "A judge may participate in civic . . . activities," but on condition that they "do not reflect upon his impartiality." Canon 5 (B). Toward preserving evenhandedness, and the outward signs of that quality, a judge "must . . . accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." ABA commentary on Canon 2 (B); and see the remarks of this court in *In the Matter of Troy*, 364 Mass. 15, 71 (1973), quoted in the margin.[6] The circumstances ex-

---

[5] The reference is to the commentary published by the American Bar Association when it promulgated the Code of Judicial Conduct (1972), which was largely adopted by this court in rule 3:25.

[6] We said: "Unquestionably a judge is entitled to lead his own private life free from unwarranted intrusion. But even there, subjected as he is to

isting on April 5 presented an occasion on which the Chief
Justice was required to accept a "restriction."

As already noted, the Chief Justice like other judges is en-
titled to and can assert constitutional rights of speech and
association (including assembly). Still it is clear that judges,
in company with other public servants, must suffer from
time to time such limits on these rights as are appropriate to
the exercise in given situations of their official duties or
functions. See *Broderick* v. *Police Comm'r of Boston*, 368
Mass. 33, 37, 42-43 (1975); *Boston Police Patrolmen's Ass'n*
v. *Boston*, 367 Mass. 368, 374-375 (1975); *United States
Civil Serv. Comm'n* v. *National Ass'n of Letter Carriers*,
413 U.S. 548, 565, 567 (1973); *Morial* v. *Judiciary Comm'n
of La.*, 565 F.2d 295 (5th Cir. 1977) (en banc), cert. denied,
435 U.S. 1013 (1978);[7] *Perry* v. *St. Pierre*, 518 F.2d 184 (2d
Cir. 1975); *In re Gaulkin*, 69 N.J. 185, 191 (1976). We
acknowledge, as recently stated by the Supreme Court of
the United States in *In re Primus*, 436 U.S. 412, 426 (1978),
that "'broad rules framed to protect the public and to
preserve respect for the administration of justice' must not
work a significant impairment of 'the value of associational
freedoms.'" Any limits imposed must find affirmative
justification in the particular facts, having in view the
weight and significance of the constitutional values thus
temporarily subordinated. Cf. *Landmark Communica-
tions, Inc.* v. *Virginia*, 435 U.S. 829 (1978). After considera-
tion of the full factual background developed in these pro-

---

constant public scrutiny in his community and beyond, he must adhere to
standards of probity and propriety higher than those deemed acceptable
for others. More is expected of him and, since he is a judge, rightfully so.
A judge should weigh this before he accepts his office. He cannot thus
engage rightfully in some commercial ventures, some public expressions,
some pleasurable diversions, and in some social contacts which are open
to others."

[7] The *Morial* case considered in some detail a problem that may be
thought much more difficult than ours — the constitutionality of a rule
requiring that an elected State judge resign in order to run for election to a
nonjudicial office. The Federal Court of Appeals upheld the rule, and
review was refused by the Supreme Court of the United States.

ceedings, the court holds that there was ample justification for requiring of the Chief Justice the exercise of a mild self-restraint, in which he failed. Neither the requirement nor a sanction for the failure raises any serious question under the First or Fourteenth Amendment to the United States Constitution or corresponding provisions of the Constitution of the Commonwealth.[8]

To deal with the particular charges:

The first four charges of the information relate to the Chief Justice's attendance at the meeting of April 5 and the essential accusation is that he "should have known and knew," in advance, that the meeting was intended as a fund raiser for the pending cases at which it was likely there would be discussion of the cases, and as expected partisan discussion occurred. The assertion that the Chief Justice "knew" is not proved in the opinion of a majority of the court, but the rest is found in substance and effect. As the Chief Justice "should have known" the character of the meeting and its bearing on cases pending in his court, but nevertheless attended it, he violated Canons 2 (A) and 5 (B), in that he failed to conduct himself in a manner that promoted public confidence in the integrity and impartiality of the judiciary and engaged in extra-judicial activities which reflected adversely on his impartiality and interfered with the performance of his judicial duties, thus also violating S.J.C. Rule 3:17 (2) by engaging in conduct prejudicial to the administration of justice which brought the judicial office into disrepute. In considering these charges we have attached no additional significance or weight to the fact that, having chosen to attend the meeting, the Chief Justice remained to its close and met with the principal speaker thereafter.

In the opinion of a majority of the court, it is not proved that the Chief Justice knowingly made false statements in

---

[8] We express thanks for a brief submitted by the Massachusetts Civil Liberties Union, as a friend of the court, which dealt with the constitutional issues.

his press release of April 7 or in his testimony on April 11 (fifth charge), or that he sought to have his administrative assistant make a statement which he knew would be false or materially misleading (sixth charge).

### Disposition.

We conclude that the facts proved concerning the events surrounding the Chief Justice's attendance at the meeting at the Arlington Street Church and the facts established with respect to the eighth and ninth charges warrant a public censure of Chief Justice Bonin. The Chief Justice's conduct was improper and created the appearance of impropriety, bias, and special influence. A judge, particularly a chief justice, must be sensitive to the impression which his conduct creates in the minds of the public. The Chief Justice has manifested an unacceptable degree of insensitivity to those special obligations which are imposed on a person in his position. He has failed to perceive that the public often does not distinguish between a chief justice as a judge and a chief justice as a person. For example, to use his position as a chief justice to justify obtaining reserved seats at the meeting at the Arlington Street Church and then to expect that the public should view his presence there merely as that of a private citizen, shows an inclination to accept the benefits of his office unaccompanied by any of its burdens.

Robert M. Bonin is hereby publicly censured.

We recognize that the question whether the Chief Justice should continue to serve and to receive compensation as such is one which is not assigned to the judicial department under the Constitution of the Commonwealth. See *Matter of Troy*, 364 Mass. 15, 21-22 (1973); *Matter of DeSaulnier (No. 4)*, 360 Mass. 787, 807-809 (1972). But we deem it appropriate, pursuant to our constitutional and statutory powers of supervision over the courts of the Commonwealth, that the suspension of the Chief Justice should extend for a reasonable time to permit the executive and legislative branches to consider, if they wish, the question of the

continuance of the Chief Justice in office, on the basis of such factors as they think appropriate, including, perhaps, the record before us and the conclusions we have drawn from it. A transcript of this proceeding and the exhibits are available to the Governor and the Legislature on request. The order of suspension shall continue in effect until further order of this court, but that order will be continued only for a reasonable period, as described above.

*So ordered.*

APPENDIX "A"

## BEFORE THE COMMITTEE ON JUDICIAL RESPONSIBILITY INQUIRY CONCERNING A JUDGE NOS. 77-67 and 77-108

### *NOTICE OF FORMAL PROCEEDINGS*

The Committee on Judicial Responsibility hereby gives notice to Robert M. Bonin, Chief Justice of the Superior Court of the Commonwealth of Massachusetts (the "Respondent"), that it has concluded that formal proceedings shall be and hereby are instituted against him in connection with the charges set forth herein.

### *First Charge*

1. On April 3, 1978, the Respondent purchased tickets for a meeting to be held on April 5, 1978, at the Arlington Street Church, Boston, Massachusetts, for the benefit of the Boston/Boise Committee at which the principal speaker was to be Gore Vidal addressing the subject of "Sex and Politics in Massachusetts" (the "Meeting").

2. On April 5, 1978, the Respondent in fact attended the Meeting.

3. Prior to attending the Meeting, the Respondent was informed, should have known and knew that the proceeds of

the ticket sales were intended to be used in part for the benefit of the defendants in 24 criminal cases which he knew were then pending in the Superior Court (the "Cases") and to assist them in the defense of such Cases and for the assistance of witnesses and others involved in the Cases.

THEREFORE, it is charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:25, Canon 2A, in that he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary; and Canon 5B, in that he engaged in extra-judicial activities which reflect adversely on his impartiality and interfere with the performance of his judicial duties. It is also charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Second Charge

4. Paragraphs 1 and 2 hereinabove are hereby incorporated by reference in this Second Charge.

5. Prior to attending the Meeting the Respondent should have known and knew that the Cases would be or were likely to be discussed.

6. The Cases and other criminal matters which Respondent knew might be heard in Superior Court were discussed in Respondent's presence at the Meeting. Such discussion included, among other things, statements concerning the merits of the Cases and such other criminal matters, criticism of the administration of justice in connection with the Cases and expressions of doubt as to whether defendants in the Cases could receive a fair trial.

THEREFORE, it is charged that, by the foregoing acts, the Respondent violated Supreme Judical Court Rule 3:25, Canon 2A, in that he failed to conduct himself in a manner that promotes public confidence in the integrity and impar-

tiality of the judiciary; and Canon 5B, in that he engaged in extra-judicial activities which reflect adversely on his impartiality and interfere with the performance of his judicial duties. It is also charged that, by the foregoing acts, Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Third Charge

7. Paragraphs 1 and 2 hereinabove are hereby incorporated by reference in this Third Charge.

8. Remarks made at the Meeting in Respondent's presence included:

    a. Statements denouncing the Cases as improperly motivated;

    b. Statements concerning the status of the Cases;

    c. Statements concerning the merits of the Cases;

    d. Statements indicating that it was unlikely that defendants in the Cases could or would receive a fair trial;

    e. A statement that the proceeds of the ticket sales would be used largely for the benefit of defendants in the Cases and of others involved in the Cases; and

    f. Statements concerning the status and merits of other criminal matters which Respondent knew might be heard in Superior Court.

9. Respondent did not leave the Meeting after any and all of such statements and prior to its conclusion.

THEREFORE, it is charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:25, Canon 2A, in that he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary; and Canon 5B in that he engaged in

extra-judicial activities which reflect adversely on his impartiality and interfere with the performance of his judicial duties. It is also charged that, by the foregoing acts, Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Fourth Charge

10. Paragraphs 1 to 9 hereinabove are hereby incorporated by reference in this Fourth Charge.

11. At the conclusion of the Meeting, the Respondent met with the principal speaker at the Meeting and engaged in friendly conversation with him.

12. Respondent should have known and knew that the foregoing meeting and conversation were likely to be photographed and publicized and would give the appearance that he endorsed the criticism at the Meeting of the administration of justice and endorsed the raising of funds for the benefit of defendants in the Cases.

13. The fact of the foregoing meeting and conversation was photographed and publicized.

THEREFORE, it is charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:25, Canon 2A, in that he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary; Canon 2B, in that he lent the prestige of his office to advance the private interests of others and permitted them to convey the impression that they are in a special position to influence him; and Canon 5B, in that he engaged in extra-judicial activities which reflect adversely on his impartiality and interfere with the performance of his judicial duties. It is also charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Fifth Charge

14. Paragraphs 1 and 2 hereinabove are hereby incorporated by reference in this Fifth Charge.

15. On April 11, 1978, the Respondent, under oath, stated, in substance and effect, that:

    a. He made no inquiry prior to the Meeting as to the nature of the Boston/Boise Committee;

    b. He was not advised prior to the Meeting that the Boston/Boise Comittee would use the funds raised by the Meeting for the benefit of the defendants or others involved in the Cases;

    c. There was no reference to the Cases at the Meeting prior to the remarks of Thomas Reeves;

    d. There was no reference at the Meeting to the use of funds derived from the Meeting; and

    e. The only remark by Thomas Reeves, which related to the Cases, which Respondent recalled, pertained to the age of alleged victims.

Each of the foregoing statements was material to the investigation then being conducted. Respondent should have known and, in fact, knew that each of the foregoing statements was false.

16. On April 7, 1978, the Respondent issued a press release which, among other things, stated, in substance and effect, that Respondent did not learn of the intended use of the funds raised by the Meeting until reading it in the press on April 6, 1978, the day following the Meeting. The Respondent should have known and, in fact, knew that this statement was false.

THEREFORE, it is charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:25, Canon 2A, in that he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. It is also charged that, by the forego-

ing acts, the Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Sixth Charge

17. Paragraphs 1 to 3 hereinabove are hereby incorporated by reference in this Sixth Charge.

18. On or about April 6, 1978, the Respondent, for his own benefit, sought to have Francis X. Orfanello, Administrative Assistant to the Chief Justice of the Superior Court, make a statement relating to the matters which are the subject of the five charges previously set forth herein, which the Respondent knew would be false or materially misleading if made, in that Respondent said to Mr. Orfanello, in substance and effect: "Frank, it's important that I did not know that the money was for the defense of those defendants. It's important that I only knew it was for gays or gay people." At the time he made the foregoing statement, the Respondent should have known, and knew, that prior to attending the Meeting he was actually advised by Mr. Orfanello, in substance and effect, that the proceeds of the Meeting would be used for the defense of defendants in the Cases.

THEREFORE, it is charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:25, Canon 2A, in that he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. It is also charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Seventh Charge

19. The Respondent has been Chief Justice of the Superior Court of the Commonwealth of Massachusetts since March 7, 1977.

20. The Richard J. Conboy Insurance Agency, Inc. ("Conboy") is a corporation with its usual place of business in Boston, Massachusetts. Its business includes selling multiple employer group life insurance to attorneys in Massachusetts and elsewhere.

21. Subsequent to March 7, 1977, Conboy paid approximately $385 for a reception for Respondent held on March 7, 1977.

22. Subsequent to March 7, 1977, Conboy paid in excess of $1,700 for a dinner for Respondent held on March 10, 1977.

23. In 1977, Conboy paid in excess of $1,800 for the rental of a Ford LTD automobile leased in the name of Respondent's wife, Angela Bonin. Said automobile was used by the Respondent and his wife.

THEREFORE, it is charged that, by the foregoing acts, the Respondent has violated Supreme Judicial Court Rule 3:25, Canon 2, in that he failed to avoid impropriety or the appearance of impropriety; and Canon 2B, in that he lent the prestige of his office to advance the interests of others or permitted others to convey the impression that they are in a special position to influence him. It is also charged that, by the foregoing acts, Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

### Eighth Charge

24. Paragraphs 19 to 23 hereinabove are hereby incorporated by reference in this Eighth Charge.

25. Martin J. Kelley of Plymouth, Massachusetts, is an officer and director of Conboy. The car rental payments by Conboy described in paragraph 23 hereinabove were ultimately treated by Conboy as compensation to Martin J. Kelley and two other Conboy officials.

26. Roberta Downey of Canton, Massachusetts, is Martin J. Kelley's step-sister.

27. In August 1977, Respondent appointed Roberta Downey as a secretary in the Office of the Chief Justice of the Superior Court.

THEREFORE, it is charged that, by the foregoing acts, the Respondent has violated Supreme Judicial Court Rule 3:25, Canon 3B, in that he failed to exercise his power of appointment only on the basis of merit; and Canon 2, in that he failed to avoid impropriety or the appearance of impropriety. It is also charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

## Ninth Charge

28. Paragraphs 19 to 27 hereinabove are hereby incorporated by reference in this Ninth Charge.

29. The Respondent was employed by the Office of the Attorney General of the Commonwealth of Massachusetts from January 1975 to March 1977.

30. During all or part of the period in which the Respondent served as First Assistant Attorney General, Pauline Dionne Mastronadi [Mastronardi] of Revere, Massachusetts, and Mary Stanton of Boston, Massachusetts, were each employed as a secretary by the Office of the Attorney General of the Commonwealth of Massachusetts and worked for and under the supervision of the Respondent.

31. During the period in which he served as First Assistant Attorney General, the Respondent rendered legal services for Conboy and its affiliate, Northeast Administrators, Inc. ("Northeast"). The Respondent was paid $1,000 per month, amounting to a total of $25,000 for such services.

32. During the period in which each worked for the Respondent in the Office of the Attorney General of the Commonwealth of Massachusetts, Ms. Mastronadi and Ms. Stanton performed secretarial services in connection with the legal services Respondent was rendering to Conboy and

Northeast; neither was compensated by the Respondent, Conboy or Northeast for such secretarial services.

33. During the period in which he served as First Assistant Attorney General, the Respondent caused an attorney employed by the Office of the Attorney General of the Commonwealth of Massachusetts, who was serving under his supervision as his assistant, to render legal services on behalf of Conboy and Northeast; said assistant was not compensated by the Respondent, Conboy or Northeast for such legal services. Ms. Mastronadi and Ms. Stanton also performed secretarial services for the said assistant in connection with such legal services; neither was compensated by the Respondent, Conboy or Northeast for such secretarial services.

34. In August 1977, Respondent appointed Ms. Mastronadi and Ms. Stanton as secretaries in the Office of the Chief Justice of the Superior Court.

THEREFORE, it is charged that, by the foregoing acts, the Respondent has violated Supreme Judicial Court Rule 3:25, Canon 3B, in that he failed to exercise his power of appointment only on the basis of merit; and Canon 2, in that he failed to avoid impropriety or the appearance of impropriety. It is also charged that, by the foregoing acts, the Respondent violated Supreme Judicial Court Rule 3:17(2), in that he engaged in misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

In accordance with the Operating Rules of the Committee on Judicial Responsibility, the Respondent is hereby advised that he may file a written answer to the foregoing charges within twenty days hereof.

COMMITTEE ON JUDICIAL RESPONSIBILITY

By its Chairman and Counsel
Allan G. Rodgers, Chairman
Robert W. Meserve, Counsel
Mark L. Wolf, Counsel

April 20, 1978

In the Matter of Bonin.

## CERTIFICATE OF SERVICE

I, Mark L. Wolf, Counsel for the Committee on Judicial Responsibility, hereby certify that I have on this date made service of the foregoing Notice of Formal Proceedings upon Robert M. Bonin by mailing a copy thereof by registered mail to Robert M. Bonin, 18 Browne Street, Brookline, Massachusetts 02146.

Mark L. Wolf

April 20, 1978

APPENDIX "B"

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPREME JUDICIAL COURT
                                              No. 1425

IN THE MATTER OF AN INFORMATION —
HONORABLE ROBERT M. BONIN

*RESPONDENT'S RESPONSE TO NOTICE OF
FORMAL PROCEEDINGS*

Now comes the Respondent, Robert M. Bonin, Chief Justice of the Superior Court of the Commonwealth of Massachusetts, and answers the formal charges against him as follows:

*First Charge*

1. and 2. The Respondent admits the allegations in Paragraphs 1 and 2 except that he believed that he was attending a lecture and not a meeting. Further, the Respondent states that the article calling the "lecture" to his attention stated as

follows (appearing in the April 2, 1978 edition of the Boston Sunday Globe): "Author Gore Vidal will discuss 'Sex and Politics in Massachusetts' Wednesday evening at the Arlington Street Church. Admission is $5 and the funds will be used to benefit the Boston/Boise Committee."

3. Respondent denies the allegations in Paragraph 3. Further, the Respondent states that subsequent to April 5, 1978, he was informed and believes and therefore avers that no funds of the Boston/Boise Committee have in fact or will in fact be used for the benefit of any individual defendants and that the Boston/Boise Committee is not a defense committee, but a civil liberties and educational group.

WHEREFORE, the Respondent demands that this charge be dismissed.

### Second Charge

4. No further answer required.

5. Respondent denies the allegations contained in Paragraph 5.

6. Respondent denies that he knew prior to attending the lecture that any cases would be discussed. The transcripts of the speakers at the lecture is a matter of record and the respondent does not deny the accuracy of those transcripts as reflecting what was actually said.

Since the Respondent admits the accuracy of the transcripts, they will speak for themselves. There is no averment that Respondent heard any "discussion." Further, the Respondent states that his sole purpose in attending the event was to hear Author Gore Vidal and that his attention was not fully directed to the remarks of other speakers who preceded Mr. Vidal.

Since the Respondent has admitted the accuracy of transcripts of the event, the characterizations as to what was said are so vague and imprecise as to be not capable of more specific response.

WHEREFORE, the Respondent demands that this charge be dismissed.

## Third Charge

7. No further answer required.

8. The Respondent has admitted the accuracy of the transcripts of the remarks of the several speakers at the lecture on April 5, 1978 in paragraph 6 of this answer and again asserts that they correctly reflect what was actually said. The Respondent states, however, that materials contained in sections a., b., c., d., e., and f., are characterizations and conclusions as to what was said as interpreted by the drafters of the charges. The true characterization of statements made at the event are matters for the court to determine. The Respondent further points out that there is no allegation in the Third Charge that the remarks and statements of all of the speakers were heard and understood. (Reference is made to Respondent's answer to Paragraph 6) Respondent specifically denies that he heard and understood any matters requiring him to leave prior to the conclusion of the event.

9. Respondent admits that he did not leave the event prior to its conclusion and states that he did not hear any remarks which imposed upon him any duty to leave. In addition, the Respondent states that a reading of the entire transcript of the event does not reveal any material that would under the law have imposed upon him any duty to leave.

WHEREFORE, the respondent demands that this charge be dismissed.

## Fourth Charge

10. No further answer required.

11. Respondent admits to being introduced to author Gore Vidal at the conclusion of the meeting and to having engaged in a very brief conversation lasting less than a minute.

12. Prior to meeting with Mr. Vidal, the Respondent did not know that such meeting would likely be photographed

or publicized. The Respondent further states that under the circumstances it was not improper for him to be introduced to and meet a noted author and lecturer. Under no circumstances should such a meeting be termed improper conduct or an endorsement of any views of Mr. Vidal or other speakers. Further, the Respondent says that this charge is repugnant to basic fundamental rights of any person.

13. Respondent admits the allegations of Paragraph 13.

WHEREFORE, the Respondent demands that this charge be dismissed.

### Fifth Charge

14. No further answer required.

15. Respondent admits that on April 11, 1978 he testified under oath.

> a. Respondent states that the specific language is not set forth and a fair reading of the transcript does not justify the assertion and conclusion of section a.
>
> b. Respondent admits the allegations of section b. and states that the statements are true.
>
> c. Respondent states that the specific language is not set forth and a fair reading of the transcript does not justify the assertion and conclusion of section c.
>
> d. Respondent admits the allegation of section d. and states that he recalls hearing no such reference.
>
> e. Respondent states that the specific language is not set forth and a fair reading of the transcript does not justify the assertion and conclusion of section e.

As to the remaining allegations of Paragraph 15, the Respondent denies that he made any statement which he knew was false and states that he testified in good faith to the best of his recollection.

16. Respondent admits issuing the press release dated April 7, 1978 and admits that Paragraph 16 correctly sum-

marizes a portion of the contents of such release but denies that any statement in such release was false.

WHEREFORE, the Respondent demands that this charge be dismissed.

### Sixth Charge

17. No further answer required.

18. Respondent denies the allegations in Paragraph 18.

WHEREFORE, the Respondent demands that this charge be dismissed.

### Seventh Charge

19. Respondent admits the allegations of Paragraph 19.

20. Respondent admits the allegations of Paragraph 20.

21. Respondent admits that the reception was held although the cost was not personally known to the Respondent. The Respondent further states that neither the Conboy Agency nor anyone affiliated with it was listed as a host or sponsor and therefore no "prestige" attached thereto, nor was any impression of special influence conveyed.

22. Respondent admits that the dinner was held although the cost was not personally known to the Respondent. The Respondent further states that neither the Conboy Agency nor anyone affiliated with it was listed as a host or sponsor and therefore no "prestige" attached thereto, nor was any impression of special influence conveyed.

23. Respondent admits the allegations of Paragraph 23 but states that the cost was charged to individual officials of Conboy as set forth in Paragraph 25. Respondent further states that he reported this gift together with all other matters required by him to be reported and that there was no impropriety in connection with the allegations of the Seventh Charge.

WHEREFORE, the Respondent demands that this charge be dismissed.

### Eighth Charge

24. No further answer required.

25. Respondent admits the allegation in Paragraph 25.

26. Respondent admits the allegation in Paragraph 26.

27. Respondent admits the allegations in Paragraph 27 and Respondent further states that when Ms. Downey was appointed there was a valid opening for the position and that the appointment was made strictly upon the basis of merit and respondent's familiarity with the work and capabilities of Ms. Downey.

WHEREFORE, the Respondent demands that this charge be dismissed.

### Ninth Charge

28. No further answer required.

29. Respondent admits the allegations of Paragraph 29.

30. Respondent admits the allegations of Paragraph 30.

31. Respondent admits the allegations of Paragraph 31.

32. Respondent admits the allegations of Paragraph 32 except that the Respondent states that the work was done on a voluntary basis.

33. Respondent admits the allegations of Paragraph 33 except that the Respondent states that the work was done on a voluntary basis.

34. Respondent admits the allegation in Paragraph 34 and Respondent further states that when Ms. Mastronadi and Ms. Stanton were appointed there were valid openings in the positions and that the appointments were made strictly upon the basis of merit and Respondent's familiarity with the work and capabilities of Ms. Mastronadi and Ms. Stanton.

WHEREFORE, the Respondent demands that this charge be dismissed.

> ROBERT M. BONIN
> Chief Justice, Superior Court
> Commonwealth of Massachusetts

Counsel:

PAUL R. SUGARMAN

DAVID J. SARGENT

QUIRICO, J. (concurring). I concur with the opinion in so far as it states the facts found, and with the discipline imposed on the basis of those facts. However, as indicated below, on the basis of the entire evidence and the inferences drawn therefrom, I would find facts in addition to those found by the court in that part of the opinion identified as "B. Charges Related to the Events at the Arlington Street Church on April 5, 1978. Findings of Fact."

*Finding 2.* I would insert before the last two sentences of the first paragraph of this finding an additional finding that the ticket seller's answer to the Chief Justice's question about "what Boston/Boise was all about" was heard and understood by the Chief Justice.

*Finding 4.* I would insert after the first two sentences of the first paragraph of this finding an additional finding that as part of the conversation described in the first two sentences Mr. Orfanello told the Chief Justice that Mr. McMenimen represented a defendant in the Revere cases and that the meeting at the Arlington Street Church was to be a fund raiser in connection with those cases.

*Finding 5.* Based on the two additional findings suggested above, I would change the first sentence in the second paragraph of this finding to read as follows: "The Chief Justice knew before he went to the meeting at the Arlington Street Church that it would at least in part be a partisan rally in the interest of criminal defendants in cases pending in

the Superior Court, that the Revere cases were likely to be discussed, and that the proceeds of ticket sales might be used in part for the benefit of the defendants in those cases."

*Finding 8.* I would insert after the first sentence in the second paragraph of this finding an additional finding that as a part of the same conversation described in the first sentence the Chief Justice showed Mr. Orfanello one of the tickets to the Gore Vidal lecture, said that it did not say it was for a defense fund, and that it was important to the Chief Justice that he knew only that the meeting was for a "gay" group or a "gay" affair; whereupon Mr. Orfanello said that if that was what the Chief Justice wanted him to say, he would say that.

*Finding 9.* I would add to the second paragraph of this finding an additional finding that the two sentences quoted from the Chief Justice's press release of April 7, 1978, were false and misleading.

*Finding 10.* As to question (a) and the answer thereto, quoted from the transcript of April 11, 1978, I would find that when purchasing the tickets at the Arlington Street Church on April 3, 1978, the Chief Justice made inquiry as to the nature of the Boston/Boise Committee, and that therefore his answer to question (a) is false.

As to question (b) and the answer thereto quoted from the same transcript, I would find that before attending the meeting at the Arlington Street Church the Chief Justice had been informed by Mr. Orfanello in effect that the meeting was to be a fund raiser for the benefit of defendants in the Revere cases. I would therefore also find that his answer of "I did not" to question (b) was false.

I recognize that the additional findings which I have suggested above depend on preliminary decisions concerning the credibility of the oral testimony of witnesses. Those are decisions which must be made by each of the Justices in his or her capacity as a finder of the facts in this proceeding. I respect the preliminary decision reached by my fellow Justices, but I differ from them to the extent stated above. If the additional findings which I propose were made, the

disposition of this proceeding would, in my opinion, require that Chief Justice Bonin be suspended as a member of the bar of this Commonwealth, and probably would warrant consideration of even more severe discipline.

BRAUCHER, J. (concurring). In order to achieve consensus among views which inevitably differ in detail, the court has omitted from its opinion facts that seem important to me. Since others feel compelled, in good conscience, to record their differences, I state mine. I join in the court's opinion, as far as it goes.

Mr. Orfanello appeared before us as an honorable, loyal and reliable public servant, but as a witness whose memory was not always accurate. He had been appointed administrative assistant by the Chief Justice's predecessor in office, who had vigorously opposed and publicly denounced the appointment of Chief Justice Bonin. The Chief Justice did not have a high regard for the administrative assistant he had inherited, and Mr. Orfanello was aware of that fact and was concerned about his tenure. The two did not communicate easily and freely.

On the morning of Thursday, April 6, 1978, both men saw the front page news story with the headline "Bonin at benefit for sex defendants." The Chief Justice was under investigation on a variety of charges, most of which have since been dropped, and he had for several months been the subject of violent public criticism. He doubtless felt unfairly pursued and persecuted. On Wednesday he had treated friendly attempts to warn him as invasions of his privacy, reacting with the kind of stubborn resistance that produces self-inflicted wounds.

In this situation the Chief Justice made an attempt, with the aid of counsel, to reconstruct the events of Wednesday and to issue a press release that would square with what he could remember and with what he could ascertain. His reconstructed memory, based in part on Mr. Orfanello's written statement made on Friday morning, was more

positive than it should have been, and some of his failures of memory seem too convenient. But I cannot make a finding of deliberate falsehood on the basis of his own testimony.

Meanwhile, Mr. Orfanello had told at least three people on Thursday morning that he had warned the Chief Justice on Wednesday that the Gore Vidal meeting was a fund raiser for Superior Court criminal defendants. Later on Thursday and on Friday morning he gave two quite different accounts to counsel for the Chief Justice. I have no doubt that his Thursday morning statements were honest, but there is little to corroborate them. He now says his Thursday afternoon and Friday statements were false. By Sunday, contrary to his testimony, he must have realized that he could be blamed if he had failed to warn the Chief Justice adequately, and he consulted counsel. As counsel, he chose the former Chief Justice. Thereafter, he resolved his dilemma, and told counsel for Chief Justice Bonin that if he testified under oath he would "bury" the Chief Justice.

We must be careful to distinguish large sins from small ones. Particularly dangerous is the escalation of misunderstanding, difference of recollection, and public clamor into charges of deliberate falsehood, false swearing and the like. On the record before us, I cannot sustain such charges on the basis of Mr. Orfanello's testimony. Without that testimony, such charges are baseless.

Apart from the charges that are not proved, there is sufficient proof of actual impropriety, as distinguished from "appearance of impropriety," to warrant the court's decision. The injunction of Canon 2 of the Code of Judicial Conduct against appearance of impropriety must not be read to require that a judge cater to popular misunderstanding or prejudice in his extrajudicial conduct. His duty "to the public should never be subordinate merely because the full discharge of his obligation may be misunderstood or may tend to subject him or the legal profession to criticism." American Bar Association, Ethical Consideration 9-2, accompanying Canon 9 of the Code of Professional Respondsibility, S.J.C. Rule 3:22, 359 Mass. 829 (1972). I should be

reluctant to join in censure based solely on appearance of impropriety, and do not read *Matter of Morrissey*, 366 Mass. 11, 16 (1974), as so based.

WILKINS, J. (concurring, with whom Abrams, J., joins). Although I agree with the disposition proposed in this matter and with most of the factual conclusions expressed in the opinion of the court, I believe that certain allegations were proved which some Justices of this court have not found to have been established. Specifically, I believe that Mr. Orfanello told the Chief Justice in their brief conversation in the afternoon of April 5, 1978, in some form of words, that the "gay" benefit at the Arlington Street Church was intended to raise funds to aid in the defense of certain criminal defendants. I am satisfied that the reference to the defense fund was brief and that its full import escaped the attention of the Chief Justice, who seemed concerned about how Mr. McMenimen learned that he was going to attend the meeting and about others advising him not to attend an event sponsored by a "gay" group. I agree with Justice Braucher's characterization of the Chief Justice's reaction to these friendly attempts to warn him.

On the following morning, the Chief Justice was acutely aware of the significance of what Mr. Orfanello told him the previous afternoon concerning a "defense fund." I am persuaded that Mr. Orfanello told the Chief Justice about the use of ticket proceeds for the defense of criminal cases because on the next day the Chief Justice did not question Mr. Orfanello about, or challenge him for, not telling him that a "defense fund" was involved.

When the Chief Justice answered certain questions under oath in the course of his April 11 deposition, his testimony was incorrect. He had inquired what the Boston/Boise Committee was and had been told. He had been told that the meeting was intended to raise funds to assist in the defense of certain criminal defendants. In this respect, the Chief Justice was plainly mistaken. However, considering

the form and context of the specific questions asked of the Chief Justice, and considering the Chief Justice's very literal approach to questions, I conclude that he did not intentionally misrepresent facts when he testified under oath on April 11, 1978. He had heard something of the nature of the Boston/Boise Committee before attending the meeting but may well not have remembered his inquiry concerning it at the Arlington Street Church when he purchased the tickets. Although Mr. Orfanello told him that the meeting was a fund raiser for criminal defendants, I do not find that the Chief Justice received information concerning the use of the ticket proceeds of the precise character described in the applicable question put to him on April 11.

I believe that the press release of April 7, 1978, although literally true, was knowingly misleading. Perhaps, as he said, the Chief Justice "did not learn of the intended use of these funds until reading it in the press on April 6, 1978, the day following the lecture," but he did hear one representative of the Boston/Boise Committee say at the meeting "most of this money will be going . . . to the National Jury Project which has entered these cases in order to see that a fair trial can possibly exist." The press release may have been, as the opinion of the court states, a measure taken to moderate the public reaction. It was, however, less than a frank and complete statement of what the Chief Justice had been told and what he knew.